# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| NORA LOVE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13 C 3489 |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | Magistrate Judge Finnegan |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Plaintiff Nora Love seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 416, 423(d), 1381a. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff has now moved for summary judgment. After careful review of the record, the Court grants Plaintiff's motion and remands the case for further proceedings.

## PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on February 24, 2011, alleging in both applications that she became disabled on April 14, 2010 due to surgery on her right thumb; an inability to lift; and trembling, swelling, weakness, tingling and pain in her right hand. (R. 217, 229, 267). The Social Security Administration denied the applications initially on April 25, 2011, and again upon reconsideration on July 13, 2011. (R. 99-102, 121-25, 136-43). Plaintiff filed a timely request for hearing and appeared

before Administrative Law Judge Victoria A. Ferrer (the "ALJ") on April 25, 2012. (R. 39). The ALJ heard testimony from Plaintiff, who was represented by counsel, as well as from vocational expert Matthew C. Lampley. Shortly thereafter, on May 24, 2012, the ALJ found that Plaintiff is not disabled because she can perform both her past work as a production assembler and conveyor belt sorter, and a significant number of other light jobs available in the national economy. (R. 21-31). The Appeals Council denied Plaintiff's request for review, (R. 1-3), and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

In support of her request for remand, Plaintiff argues that the ALJ (1) made a flawed credibility determination; and (2) failed to provide adequate support for the residual functional capacity ("RFC") assessment by giving improper weight to the opinions of record. As discussed below, the Court agrees that the ALJ's decision is not supported by substantial evidence and the case must be remanded for further consideration.

## **FACTUAL BACKGROUND**

Plaintiff was born on November 10, 1959, and was 52 years old at the time of the ALJ's decision. (R. 217, 263). She completed one year of college and spent more than 14 years working in factories as a laborer. (R. 267, 287). Most recently, Plaintiff was a lead assembly worker for World Kitchen, but she had to quit after she was injured on the job in April 2010. (R. 42-43, 67, 335).

A.  **Medical History**

   1.  **2010**

Plaintiff was moving pallets at work on April 14, 2010 when she experienced a sudden, sharp pain in her right biceps and wrist, with radiating pain into the shoulder and across the forearm and elbow at a level of 10 out of 10. (R. 358). The company's physician, Mark T. Veldman, D.O., examined Plaintiff that day and observed tenderness over the proximal biceps, as well as "a 1 x 1.5 cm raised mass over the distal radius." (*Id.*). X-rays of the right elbow, both wrists and right shoulder were all normal, and Dr. Veldman diagnosed tendinitis of the right wrist/forearm and biceps. (R. 358-61). He gave Plaintiff a sling "for comfort," imposed a 2-pound lifting restriction, and instructed her to ice her wrist and shoulder and take ibuprofen. (R. 358). Two days later, Plaintiff's pain was still at a 10 out of 10, with tenderness in the right wrist and slight puffiness in the right hand. Dr. Veldman diagnosed right forearm tendinitis and left shoulder strain, and limited her to "predominantly office work seated with right arm on table, with nothing over 2 pounds lifting." (R. 353). He also told her to take Vicodin for pain at bedtime and continue icing the area. (*Id.*).

On April 19, 2010, Plaintiff started seeing orthopedist Zain Vally Mahomed, M.D., at the South Side Medical Group, L.T.D. ("South Side"). (R. 373-76). She exhibited decreased range of motion in both shoulders, including positive Neer's tests for impingement of the rotator cuff and decreased sensation in her upper arms, though her deltoid strength was 4+/5. (R. 375). A Phalen's test for carpal tunnel syndrome produced pain on the right and she had myospasm in the "bilateral forearm, extensor, and flexor tendons." (*Id.*). Dr. Mahomed diagnosed bilateral shoulder musculo-

ligamentous injury with possible rotator cuff tear; bilateral musculo-ligamentous injury with flexor tendon strain; and musculo-ligamentous injury to the left elbow and right wrist. (*Id.*). He prescribed Ultram, Mobic and Soma for pain, ordered X-rays of both elbows and an MRI of the shoulders and right wrist, and referred Plaintiff to physical therapy. (R. 375-76).

Between April 20 and June 15, 2010, Plaintiff attended physiotherapy at South Side to address her shoulder, wrist and forearm pain. (R. 379-81, 384-87, 392-95). On April 30, 2010, she had an EMG that showed evidence of radiculopathy at C6-C7.[1] (R. 366, 396). A few days later, on May 3, 2010, Plaintiff saw orthopedic surgeon David A. Schafer, M.D., of Advanced Health Medical Group, L.T.D., for further evaluation and treatment of her shoulder injury. (R. 377-78). Dr. Schafer reported decreased range of motion in both shoulders, worse on the right, "significant impingement signs," and rotator cuff weakness and severe pain to palpation of the right proximal biceps, though there was no evidence of instability. Plaintiff also exhibited pain to palpation of the right wrist, and tested positive for De Quervain's disease[2] with decreased thumb extension strength and swelling "in the area from the first dorsal compartment." (R. 378). Dr. Schafer noted that an April 22, 2010 MRI of Plaintiff's right shoulder showed a small partial thickness tear of the supraspinatus, and an MRI of the right wrist revealed "multiple small cyst[s] near the radial wrist and small fluid collections."[3] (*Id.*). He

---

[1] The EMG results are not part of the record but are referenced in reports from Dr. David Schafer and Dr. G. Klaud Miller discussed *infra*.
[2] De Quervain's tenosynovitis is "a painful condition affecting the tendons on the thumb side of your wrist. If you have De Quervain's tenosynovitis, it will probably hurt every time you turn your wrist, grasp anything or make a fist." (www.mayoclinic.org/diseases-conditions/de-quervains-tenosynovitis/basics/definition/ con-20028238, last viewed on June 13, 2014).
[3] The MRI reports themselves are not part of the record.

diagnosed right shoulder tendonitis with proximal bicep tendonitis versus tear; left shoulder tendonitis; and right wrist De Quervain tenosynovitis and cyst with likely tear. (*Id.*). He recommended a cortisone injection and restricted Plaintiff to no lifting with the right arm "because of the severity of her symptoms in the biceps." (*Id.*).

Two weeks later, on May 17, 2010, Plaintiff told Dr. Mahomed that she was feeling 10% better since her last visit, but still had pain at a level of 7/10 that was aggravated by movement. (R. 382). She continued to exhibit tenderness and decreased range of motion in the shoulders, as well as a positive Neer's sign on the right and muscle spasm "in the traps" (trapezius). She also had significant tenderness to palpation and swelling over the right wrist. (*Id.*). Dr. Mahomed instructed Plaintiff to keep taking Ultram, Mobic and Soma and continue with physiotherapy while she remained on "total temporary disability" status from work. (R. 383).

On June 1, 2010, G. Klaud Miller, M.D., conducted an independent medical evaluation of Plaintiff in connection with a workers' compensation claim. (R. 367-68). Based on his examination and a review of the medical file, (R. 363-68), Dr. Miller opined in a June 8, 2010 report that Plaintiff had "completely changed her complaints and examination on several different occasions," first exhibiting symptoms only on the right side but then developing left-sided symptoms as well. (R. 369). In Dr. Miller's view, Plaintiff complained of "non-atomic and non-physiologic findings, which cannot be explained on any objective/physiologic basis," and he saw "nothing to support" a diagnosis of De Quervain's disease or even shoulder sprain. (*Id.*). He thus concluded there was "no objective orthopaedic reason why [Plaintiff] cannot return to full duty." (*Id.*).

5

Plaintiff went back to Dr. Schafer for a follow-up visit on June 7, 2010. (R. 388-89). She had no pain to palpation and good muscle strength in the right shoulder, but she still had decreased range of motion primarily on the right with positive impingement signs. She also exhibited severe pain to palpation over the right proximal biceps and decreased thumb extension strength, though the swelling in her wrist had resolved. (R. 388). When Plaintiff saw Dr. Mahomed a week later on June 14, 2010, she continued to exhibit significant tenderness to palpation over her right shoulder, with decreased range of motion, positive Neer's test, and muscle spasm in the trapezius. (R. 390). Dr. Mahomed reported a positive Tinel's sign for carpal tunnel syndrome at the right elbow, and significant tenderness to palpation in the right wrist and forearm. (*Id.*). He recommended that Plaintiff continue with her medication and physiotherapy, referred her for chiropractic manipulation, and kept her on total temporary disability. He also suggested a shoulder injection, but Plaintiff declined. (R. 391).

On July 19, 2010, Plaintiff had another follow-up with Dr. Schafer. (R. 396-97). A Spurling test for nerve root compression was positive at that time, and Plaintiff continued to have impingement signs and rotator cuff weakness that was worse on the right side. Dr. Schafer noted that a July 2, 2010 MRI of the cervical spine showed some degenerative changes with neuroforaminal stenosis particularly at C4-C5 on the right and C5 to C7 bilaterally, and he diagnosed Plaintiff with cervical radiculopathy with bilateral shoulder tendonitis. (R. 396). He indicated that the shoulder and wrist pain were likely "secondary to cervical radiculopathy," and noted significant signs of pathology on rotator cuff test. (R. 397).

### 2. 2011

Seven months later, on February 24, 2011, Plaintiff applied for disability benefits. The following month, on March 1, 2011, Claudia Johnson, M.D., who appears to be a colleague of Dr. Mahomed, prepared a Physical Impairment Questionnaire at the request of Plaintiff's disability benefits attorney. (R. 432-34). There is no evidence that Dr. Johnson ever examined Plaintiff prior to completing this form, but she imposed extreme restrictions on Plaintiff's ability to function, including: occasional lifting/carrying of 0-5 pounds; never grasping, turning, handling or fingering with the right hand; occasional reaching with the right arm; and no pulling or pushing. (*Id.*). Dr. Johnson said that pain would frequently interfere with Plaintiff's attention and concentration; she would need unscheduled breaks every hour lasting 30 minutes; and she would be absent from work more than three times per month. (R. 433-34).

On April 2, 2011, Joseph Youkhana, M.D., performed an Internal Medicine Consultative Examination of Plaintiff for the Bureau of Disability Determination Services ("DDS"). (R. 410-13). He noted some decreased range of motion in Plaintiff's hand, but normal range of motion in the right shoulder and elbow "with pain." (R. 411). Plaintiff was able to make a fist at about 80% and her grip strength was 4/5 with no deformity or muscle atrophy. Though her right hand was sometimes shaking, Dr. Youkhana stated that it "does not look like a tremor so is probably psychological." With respect to fingering activities, Plaintiff was able to pick up small objects, but slowly; she could open a medicine bottle "with pain and slowly"; and she showed some problems with buttoning and zipping. (*Id.*). Dr. Youkhana ultimately diagnosed right hand pain. (R. 412).

Shortly thereafter, on April 21, 2011, Virgilio Pilapil, M.D., completed a Residual Functional Capacity Assessment of Plaintiff for DDS. (R. 83-90). Dr. Pilapil found that Plaintiff can occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand, walk and sit for about 6 hours in an 8-hour workday; occasionally push and pull with her right arm due to weakness and tremors; never climb ladders, ropes or scaffolds; frequently crawl; occasionally reach above shoulder level on the right; and occasionally do fine and gross manipulations with the right hand. (R. 87-88). Bharati Jhaveri, M.D., affirmed this RFC on July 7, 2011. (R. 103-10).

### 3. 2012

The next and last available medical record is from March 26, 2012, when Plaintiff saw Dr. Johnson for lower back and right hand pain. (R. 436-37). Plaintiff was unable to use her right hand at that time because of "aggravating pain, spasms and tremors," and she complained of weakness from the right side of her neck to her right hand. Plaintiff rated her pain at a level of 10/10 but was only taking Tylenol for relief. (R. 436). Dr. Johnson assessed Plaintiff with uncontrolled rheumatoid arthritis and referred her to a rheumatologist. (R. 437).

### B. Administrative Law Judge's Decision

The ALJ found that Plaintiff's right wrist and right forearm tendinitis are severe impairments, but that they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 23-24). After reviewing Plaintiff's testimony and the medical records, the ALJ determined that she has the capacity to perform light work with the following restrictions: she can frequently push and pull with

the right arm; frequently handle and finger with the right hand; frequently reach overhead with the right arm; and never climb ladders, ropes or scaffolds. (R. 24).

In reaching this conclusion, the ALJ gave great weight to Dr. Miller's June 2010 opinion that "there was no objective orthopaedic reason why [Plaintiff] could not return to full duty." (R. 28). Though Dr. Miller did not provide a function-by-function analysis of Plaintiff's abilities, the ALJ found his opinion "consistent with the findings in this decision" and with "those of the consultative examiner who noted that there w[as] no objective physical support for [Plaintiff's] tremors." (*Id.*). The ALJ also gave some weight to the opinions from Dr. Pilapil and Dr. Jhaveri, stating that their findings were "consistent with the other medical evidence of record." At the same time, the ALJ afforded only slight weight to Dr. Johnson's March 2011 opinion because she had not actually treated Plaintiff when she prepared the report, she appeared to base her conclusions on Plaintiff's subjective history, and the findings were not supported by objective evidence. (*Id.*).

With respect to Plaintiff's testimony, the ALJ noted her complaints of swelling in the right hand "due to pressure from holding things," and an inability to cook and clean. (R. 25). Plaintiff also complained in a March 17, 2011 Function Report that she cannot lift, open, close, or pick up things for long periods due to shaking and pain, (R. 275), but the ALJ discounted all of these statements given the significant gaps in her treatment history and her reports of "a wide variety" of daily activities, including going to the library, visiting family, mentoring, watching children's art classes, and reading. (R. 27-28). In addition, the ALJ observed that Plaintiff was never officially diagnosed with

9

tremors, and she found no objective support for the diagnosis of rheumatoid arthritis. (R. 27).

Based on the stated RFC, the ALJ accepted the VE's testimony that Plaintiff remains capable of performing her past work as a production assembler and conveyor belt sorter, as well as a significant number of other light jobs available in the local and national economy, including bench assembler (3,700 jobs available in Illinois and 388,000 nationwide), cashier (67,000 jobs available in Illinois and 1,400,000 nationwide), and usher (4,400 jobs available in Illinois and 335,000 nationwide). (R. 29-30). The ALJ thus concluded that Plaintiff is not disabled within the meaning of the Social Security Act, and is not entitled to benefits.

## **DISCUSSION**

### A. Standard of Review

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Skinner*, 478 F.3d at 841).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

**B.    Five-Step Inquiry**

To recover DIB or SSI under Titles II and XVI of the Social Security Act, a claimant must establish that she is disabled within the meaning of the Act. *Keener v. Astrue*, No. 06-CV-0928-MJR, 2008 WL 687132, at *1 (S.D. Ill. Mar. 10, 2008).[4] A person is disabled if she is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Crawford v. Astrue*, 633 F. Supp. 2d 618, 630 (N.D. Ill. 2009). In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to

---

[4] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq.*, and are virtually identical to the SSI regulations set forth at 20 C.F.R. § 416.901 *et seq.*

11

perform any other work? *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

**C. Analysis**

Plaintiff claims that the ALJ's decision must be reversed because she (1) made a flawed credibility determination; and (2) failed to provide adequate support for the RFC assessment by giving improper weight to the opinions of record.

**1. Credibility Determination**

Plaintiff argues that the ALJ did not properly evaluate her credibility as required by SSR 96-7p. (Doc. 14, at 11). In assessing a claimant's credibility, an ALJ must first determine whether the symptoms are supported by medical evidence. *See* SSR 96-7p, at *2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold*, 473 F.3d at 822. *See also* 20 C.F.R. § 404.1529; *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004). Because hearing officers are in the best position to evaluate a witness's credibility, their assessment should be reversed only if "patently wrong." *Castile*, 617 F.3d at 929; *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

Plaintiff objects to the ALJ's use of the following boilerplate credibility language: Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but her "statements concerning the intensity, persistence and

limiting effects of these symptoms are not credible to the extent they are inconsistent with the" stated RFC assessment. (R. 27). The Seventh Circuit has repeatedly criticized this template as "unhelpful" and "meaningless," noting that the "hackneyed language seen universally in ALJ decisions adds nothing" to a credibility analysis. *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). *See also Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) (the template "implies that ability to work is determined first and is then used to determine the claimant's credibility. That gets things backwards.").

That said, the use of boilerplate language will not alone provide a basis for remand as long as "the ALJ said more" and gave reasons for not finding the plaintiff's testimony fully credible. *Richison v. Astrue*, 462 Fed. Appx. 622, 625 (7th Cir. 2012) (no error where ALJ used boilerplate language but then went on to question the plaintiff's testimony about resting and napping all day "given that he went hunting and apparently attempted to work on his car."). Defendant argues that the ALJ said more in this case by discussing Plaintiff's daily activities, the gaps in her treatment history, and the medical evidence. (Doc. 20, at 10). The Court disagrees, as none of these other factors provides a proper basis for the ALJ's credibility determination.

With respect to Plaintiff's daily activities, the ALJ stressed that she spent time "going to the library a couple times a week . . ., visiting family, mentoring, watching children's art classes, and reading," and also observed that Plaintiff took a bus to the hearing and can write with difficulty. (R. 28). There is no question that "an ALJ must consider the claimant's daily activities" in assessing her credibility. *Filus v. Astrue*, 694 F.3d 863, 869 (7th Cir. 2012). Here, however, it is not at all clear why the stated

activities are inconsistent with Plaintiff's claimed inability to use her right arm and hand to perform full-time work. Plaintiff testified, for example, that she uses her left hand to turn the pages of a book and does not use either hand while mentoring. (R. 62-63). In addition, Plaintiff's ability to write "with difficulty," take the bus, visit family, and watch art classes in no way demonstrates that she can frequently handle, finger, push, pull, and reach overhead with her right arm as indicated in the RFC.[5] *See Bjornson*, 671 F.3d at 647 (noting that activities of daily living are unlike full-time jobs because "a person has more flexibility in scheduling the former than the latter, can get help from other persons . . ., and is not held to a minimum standard of performance, as she would be by an employer.").

Another concern is the ALJ's emphasis on the gaps in Plaintiff's treatment. "[A] history of sporadic treatment . . . can undermine a claimant's credibility," *Shauger*, 675 F.3d at 696, but only where "the claimant does not have a good reason for the failure or infrequency of treatment." *Craft*, 539 F.3d at 679. As the Seventh Circuit has explained, an ALJ "must not draw any inferences about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care." *Id.* (citing SSR 96-7p) (internal quotations omitted). In this case, Plaintiff did not receive medical care between the summer of 2010 and March 2011, and again between March 2011 and March 2012. (R. 27). Plaintiff explained the gaps, however, by noting

---

[5] The ALJ also cited Plaintiff's testimony that up until four or five months prior to the April 2012 administrative hearing, she was able to "do all of this," which the ALJ interpreted to mean "everything." (R. 27, 46). The only examples Plaintiff gave, however, were cooking and cleaning, and she indicated in her March 17, 2011 Function Report that she cannot in fact cook because she "would drop pots with hot foods in them" and "burn [her]self," and she is unable to grip or hold things necessary to do house or yard work. (R. 46, 279-80). The ALJ did not mention this evidence or explain why she found it unpersuasive.

that she did not have any medical insurance and was unable to pay for regular doctor visits. She also indicated that Dr. Johnson wanted to get her into a research program to alleviate the financial burden. (R. 59-61). The ALJ failed to mention this testimony even though inability to afford treatment is a good reason for lack of medical care. *Shauger*, 675 F.3d at 696. Nor did the ALJ ask Plaintiff about her access to free or low-cost medical services.

That leaves the ALJ's third rationale for discounting Plaintiff's testimony: a lack of objective medical support. Specifically, the ALJ found it significant that Plaintiff's complaints of tremors are not backed by an official diagnosis, and that there likewise has been no medical testing to confirm a diagnosis of rheumatoid arthritis. (R. 27). Though this is a proper factor to consider in assessing credibility, it is well-established that an ALJ cannot rely "solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-47 (7th Cir. 2005). The ALJ did go on to note Plaintiff's testimony that Naproxyn helps reduce the pain and swelling in her hand and arm, but she did not address Plaintiff's complaints that the medication wears off after a couple of hours and causes dizziness, or indicate how this evidence impacted the credibility determination. (R. 27, 48-49).

It is entirely possible that on remand, the ALJ will once again conclude that Plaintiff's sporadic treatment history undermines her credibility despite her financial hardships. On the record presented, however, the ALJ did not articulate appropriate reasons for finding Plaintiff less than fully credible, leaving this Court "without confidence that the ALJ's decision builds a 'logical bridge' between the evidence and

15

[her] conclusion." *Willis v. Colvin*, No. 12 C 6417, 2014 WL 1031475, at *9 (N.D. Ill. Mar. 18, 2014) (quoting *Myles v. Astrue*, 582 F.3d 672, 674 (7th Cir. 2009)). Plaintiff's request for remand on this basis is therefore granted.

### 2. Remaining Arguments

In addition to reconsidering the credibility determination, the ALJ should also take the opportunity on remand to better explain why she gave the opinions from Dr. Pilapil and Dr. Jhaveri only some weight. The sole rationale in the ALJ's decision is a statement that the "findings are consistent with the other medical evidence of record." (R. 28). This does not satisfy the requirement that an ALJ "must explain the weight given to the opinions of a State agency consultant in the same way the ALJ must do for a treating physician." *Francis v. Astrue*, No. 10 C 1404, 2010 WL 5371844, at *18 (N.D. Ill Dec. 20, 2010). *See also* 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6) (for all medical opinions, ALJ must consider (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, (5) whether the opinion was from a specialist, and (6) other factors brought to the attention of the ALJ). 20 C.F.R. § 404.1527(c)(2)-(6).

Moreover, the limitations imposed by Dr. Pilapil and Dr. Jhaveri are different than those imposed by any other physician. Dr. Pilapil and Dr. Jhaveri both indicated that Plaintiff is capable of no more than occasional pushing, pulling, reaching above the shoulder, and performing of fine and gross manipulations with the right hand, whereas Dr. Miller found Plaintiff totally unlimited in her use of the right hand and arm, and Dr.

Johnson found that she can never grasp, turn, handle or finger at all. (R. 95-96, 107-08). The ALJ gave good reasons for rejecting Dr. Johnson's opinion, namely, she had not treated Plaintiff at the time of the evaluation; the extreme limitations are not supported by objective evidence; and her conclusions appear to be based on Plaintiff's subjective complaints. (R. 28). *See, e.g., Davis v. Barnhart*, 187 F. Supp. 2d 1050, 1057 (N.D. Ill. 2002) (ALJ properly discounted expert opinion where it was "a diagnosis based on subjective complaints."). However, the ALJ did not provide any rationale whatsoever for discounting the State agency physicians' opinions.

Defendant attempts to remedy this error by supplying her own explanation for the ALJ's decision – Dr. Pilapil and Dr. Jhaveri imposed limitations based in part on Plaintiff's tremors, but the ALJ accepted Dr. Youkhana's opinion that the tremors were "probably psychological." (Doc. 20, at 6-7; R. 27, 411). Of course, the Seventh Circuit has repeatedly held that "'what matters are the reasons articulated *by the ALJ*,' not the rationale supplied by the Commissioner on appeal." *Folino v. Astrue*, No. 11 C 3556, 2013 WL 535524, at *6 (N.D. Ill. Feb. 11, 2013) (quoting *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011)). In addition, the ALJ did not actually assign any particular weight to Dr. Youkhana's opinion, (R. 27), and Dr. Pilapil and Dr. Jhaveri reviewed that evaluation but still found the tremors credible based on all the record evidence. (R. 104, 113).

Viewing the record as a whole, the Court cannot say that the ALJ's error in assessing the opinions from Dr. Pilapil and Dr. Jhaveri was harmless, and this issue should be re-evaluated on remand. The ALJ should also take another look at Dr. Miller's opinion since he prepared it for Plaintiff's workers' compensation claim without

the benefit of the July 2010 MRI showing stenosis at C4-C5 on the right, and at C5-C7 bilaterally. (R. 28, 396). *See Carter v. Astrue,* 413 Fed. Appx. 899, 903-04 (7th Cir. 2011) (ALJ "acknowledged the potential bias of several opinions because they were prepared for [the claimant's] workers' compensation claim.").

## **CONCLUSION**

For the reasons stated above, Plaintiff's Motion for Summary Judgment (Doc. 13) is granted. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

ENTER:

Dated: June 18, 2014

_____
SHEILA FINNEGAN
United States Magistrate Judge